1

2

3

4

5

6

7

8                    **IN THE UNITED STATES DISTRICT COURT**

9                  **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

11   ELIAS MANUEL BRACAMONTE,              CASE NO.  1:99-cv-05845-SMS-P

12                 Petitioner,             ORDER DENYING PETITION FOR _____
                                           WRIT OF HABEAS CORPUS
13       vs.
                                           [Doc. 1]
14   LARRY SMALL,
                                           ORDER DIRECTING CLERK OF COURT
15                 Respondent.             TO ENTER JUDGMENT IN FAVOR OF
     _____/    RESPONDENT
16

17          Petitioner is a state prisoner proceeding with a petition for writ of habeas corpus pursuant to 28

18   U.S.C. § 2254.  Pursuant to 28 U.S.C. § 636(c)(1), the parties have consented to the jurisdiction of the

19   United States Magistrate Judge.

20                              PROCEDURAL HISTORY[1]

21          On July 14, 1994, Petitioner was found guilty of rape in violation of California Penal Code

22   section 261(2), forcible oral copulation in violation of California Penal Code 288a(c), sexual battery

23   in violation of California Penal Code section 243.4(a), and false imprisonment in violation of

24   California Penal Code section 236 and 237.  The court found that Petitioner had previously suffered

25   a prior felony conviction in September 1986 for attempted robbery, and a second prior felony

26   conviction in June 1988 for involuntary manslaughter.

27   _____

28          [1]  This information is derived from Petitioner's petition for writ of habeas corpus and Respondent's answer.

1

1    On September 8, 1995, Petitioner was sentenced to state prison for a term of 26 years and 8

2    months.

3    Petitioner filed a timely notice of appeal on or about April 7, 1996, with the California Court

4    of Appeal, Fifth Appellate District.  Petitioner raised two arguments.  First, he alleged that trial

5    counsel was ineffective for failing to call Petitioner's brother as a defense witness.  Second,

6    Petitioner argued that the imposition of his sentence on count 4 violated California Penal Code

7    section 654's prohibition against multiple punishment.  (Respondent's request for judicial notice,

8    filed October 29, 1999, Court Docs. 13, 14, Exhibit A.)  On December 9, 1996, the Fifth District

9    Court of Appeal affirmed the judgment, but found that "the sentence on count 4 shall be stayed

10   pending completion of the sentence on count 3, and thereafter the punishment on count 4 shall be

11   stayed permanently."  (Id. at Exhibit B.)

12   On January 8, 1997, Petitioner filed a petition for review with the California Supreme Court,

13   raising the same claims he raised in the Fifth District Court of Appeal.  (Id. at Exhibit C.)  The

14   petition was denied on February 26, 1997.  (Id. at Exhibit D.)

15   On April 27, 1998, Petitioner filed a petition for writ of habeas corpus in the Fresno County

16   Superior Court.  Petitioner alleged two claims of ineffective assistance of trial counsel and one claim

17   regarding denial of due process at sentencing.  (Id. at Exhibit E.)  On May 11, 1998, the Superior

18   Court denied the petition as being untimely.  (Id. at Exhibit F.)

19   On May 19, 1998, Petitioner filed a petition for writ of habeas corpus with the Fifth District

20   Court of Appeal, raising the same claims alleged in his April 27, 1998, state habeas petition.  (Id. at

21   Exhibit G.)  The petition was denied, without prejudice, on February 1, 1999.  (Id. at Exhibit H.)

22   On February 9, 1999, Petitioner filed a writ of habeas corpus with the California Supreme

23   Court, again raising the same allegations in his two prior state habeas petitions.[2]  (Id. at Exhibit J.)

24   On May 26, 1999, the California Supreme Court denied the petition, with a citation to In Re

25   Robbins, 18 Cal.4th 770, 7880 (1998). (Id. at Exhibit K.)

26

27      [2]  Respondent submits that on February 8, 1999, Petitioner served a copy of a pleading entitled "First Amended
     Petition For Writ Of Habeas Corpus" on Respondent.  However, there is no record of this document ever being filed in the
28   state court.

2

1      Petitioner filed the instant federal petition on June 7, 1999, raising three claims for relief.  On

2  August 31, 1999, the Court ordered Respondent to submit a response addressing the merits of the

3  Petition.

4      On October 15, 1999, Respondent filed a Motion to Dismiss the Petition on the grounds that

5  the petition had been filed outside the one-year limitations period.  On February 3, 2000, the Motion

6  was granted and the Petition was dismissed.  Petitioner submitted a timely Notice of Appeal on

7  February 18, 2000.  On October 11, 2001, the Ninth Circuit Court of Appeal reversed and remanded

8  the case.  The Court found that intervening authority rendered the Petition timely.

9      On February 11, 2002, the Court issued an Order directing Respondent to respond to the

10  merits of the Petition.  The Court granted Respondent permission to file a Motion to Dismiss for

11  Petitioner's failure to exhaust state court remedies or the untimely filing of the federal Petition.

12  However, with respect to the issue of procedural default, the Court noted that such an argument must

13  be made in an Answer addressing the petition's merits.

14      On April 1, 2002, Respondent filed a Motion to Dismiss the Petition on the basis of

15  procedural default.  The motion to dismiss did not address the merits of the Petition as ordered by the

16  Court.

17      On April 8, 2002, Petitioner submitted a Motion to Strike the Motion to Dismiss or in the

18  alternative, grant Petitioner an extension of time to formulate an opposition to the Motion to

19  Dismiss.

20      On May 9, 2002, the Court denied Petitioner's request to strike Respondent's motion to

21  dismiss and construed it as a preliminary answer.  The Court further directed Respondent to submit

22  an answer addressing the merits of the petition.  Respondent filed an answer on June 14, 2002.

23  Petitioner filed a traverse on September 3, 2002.  On May 13, 2003, the Court issued an order

24  informing Respondent that  it did not have all the necessary information regarding procedural default

25  and granted Respondent thirty days to file a supplemental brief demonstrating adequacy of the

26  procedural default rule or express its desire to excuse procedural default.  Respondent filed a

27  response on June 23, 2003.

28  //

1

<u>STATEMENT OF FACTS</u>[3]

2

On March 6, 1994, Petitioner asked his 15-year-old daughter, Priscilla, if she wanted to go with him to smoke marijuana. Priscilla said yes. Petitioner drove her to an isolated area where the two previously shared marijuana.

3

On this occasion, however, Petitioner started talking about Priscilla's breasts and comparing her body to that of a female neighbor. He asked, then told, Priscilla to show him her breasts. She declined. He grabbed her breast and squeezed hard. Priscilla, frightened, asked to be taken home, but Petitioner said he was the stronger of the two and that she could not stop him.

4

Priscilla started to get out of the car. Petitioner ran around the car and pushed Priscilla down and across the front seat. Petitioner got on top of Priscilla. He pushed up her shirt and bra and sucked on her breast. After striking Priscilla a few times in the face to obtain some level of cooperation, Petitioner pulled Priscilla's pants and underwear down below her knees, dropped his own pants and tried to rape Priscilla. Petitioner's penis was insufficiently erect to achieve more than slight penetration, however. After Priscilla pulled her clothes back on, Petitioner forced her head into his lap and demanded she orally copulate him. She did so briefly and Petitioner ejaculated.

5

6

7

8

9

10

Afterward, Petitioner drove Priscilla back to his mother's home, where both Petitioner and Priscilla had been living. Petitioner left, and Priscilla ran into the house crying. Priscilla told her grandmother that Petitioner tried to rape her. The grandmother called the sheriff's department. After interviewing Priscilla and locating Petitioner at his wife's house, deputies arrested Petitioner. They asked if he had any weapons. "Yes. My dick," he replied.

11

12

13

The next day, a detective again interviewed Priscilla. He saw she had a black eye and redness and swelling on both cheeks. The detective then interviewed Petitioner and related to him Priscilla's description of events. Petitioner responded that if Priscilla said it happened, it probably did happen; he said she had no reason to lie about it. Petitioner was remorseful and said he could never face his family again.

14

15

By the time of trial in July 1994, Petitioner had managed to face at least part of his family again during visits at the jail, and they had agreed to testify for the defense at trial. Rita Bracamonte, Petitioner's mother, and Carolyn Padilla, the girlfriend of Petitioner's brother, both testified that Priscilla came into the house crying on March 6, 1994. Both said that Priscilla's face was red and puffy, and that Priscilla either said Petitioner raped her (Padilla) or tried to rape her (Rita). After Rita called the sheriff, a deputy interviewed Priscilla. He asked Rita and Padilla to take Priscilla into another room and examine her body for signs of assault. Both went with Priscilla to a bedroom. They saw no marks on her upper body, and Priscilla declined to let them inspect her lower body, telling Rita that Petitioner "didn't go in my pants" or "He didn't go into my pants." Padilla reported this last comment as, "Well, no he didn't do [anything] there."

16

17

18

19

20

21

The next day, Padilla asked Priscilla how she was doing. Priscilla said nothing had happened "at all" the day before; Priscilla explained that she had just been upset the day before "because [Petitioner] had hit her." A few days later, Priscilla was talking to a neighbor, Rebecca Overstreet, telling the neighbor that Priscilla did not want to testify against her father. The neighbor told Priscilla that she should testify if she was telling the truth. Priscilla told the neighbor "at that time that

22

23

24

25

26

27

28

---

[3]  The following summary of facts are taken from the opinion of the California Court of Appeal, Fifth Appellate District appearing as Exhibit D, of the Answer to the Petition for Writ of Habeas Corpus.  The Court finds the state Court of Appeal's summary is a correct and fair summary of the facts of the case.  Although this appeal involved different claims than the present, the facts underlying Petitioner's conviction are nonetheless the same.

4

1    it wasn't true, that the only reason why she was doing it 'was' because she was being
     pressured." Priscilla said she did not want to testify because "nothing happened."
2    Priscilla also told Rita on several subsequent occasions that Rita should not have
     called the sheriff because "nothing really happened."
3

(Opinion at 2-4, Exhibit D, attached to Respondent's Answer.)
4
                                    DISCUSSION
5

6    A.    Jurisdiction

7          Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant

8    to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of

9    the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362,

10   375, 120 S.Ct. 1495, 1504, n.7 (2000). Petitioner asserts that he suffered violations of his rights as

11   guaranteed by the U.S. Constitution. The challenged conviction arises out of the Fresno County

12   Superior Court, which is located within the jurisdiction of this Court. 28 U.S.C. § 2254(a); 2241(d).

13         On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of

14   1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment.

15   Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059, 2063 (1997), *cert. denied,* 522 U.S. 1008, 118 S.Ct.

16   586 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997) (quoting Drinkard v. Johnson, 97

17   F.3d 751, 769 (5th Cir.1996), *cert. denied,* 520 U.S. 1107, 117 S.Ct. 1114 (1997), *overruled on other*

18   *grounds by* Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059 (1997) (holding AEDPA only applicable

19   to cases filed after statute's enactment). The instant petition was filed after the enactment of the

20   AEDPA and is therefore governed by its provisions.

21   B.    Standard of Review

22         This Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody

23   pursuant to the judgment of a State court only on the ground that he is in custody in violation of the

24   Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

25         The AEDPA altered the standard of review that a federal habeas court must apply with

26   respect to a state prisoner's claim that was adjudicated on the merits in state court. Williams v.

27   Taylor, 120 S.Ct. 1495, 1518-23 (2000). Under the AEDPA, an application for habeas corpus will

28   not be granted unless the adjudication of the claim "resulted in a decision that was contrary to, or

                                            5

1   involved an unreasonable application of, clearly established Federal law, as determined by the

2   Supreme Court of the United States;" or "resulted in a decision that was based on an unreasonable

3   determination of the facts in light of the evidence presented in the State Court proceeding." 28

4   U.S.C. § 2254(d); Lockyer v. Andrade, 123 S.Ct.1166 (2003) (disapproving of the Ninth Circuit's

5   approach in Van Tran v. Lindsey, 212 F.3d 1143 (9th Cir. 2000)); Williams v. Taylor, 120 S.Ct.

6   1495, 1523 (2000).  "A federal habeas court may not issue the writ simply because that court

7   concludes in its independent judgment that the relevant state-court decision applied clearly

8   established federal law erroneously or incorrectly."  Lockyer, at 1175 (citations omitted).  "Rather,

9   that application must be objectively unreasonable."  Id. (citations omitted).

10      While habeas corpus relief is an important instrument to assure that individuals are

11   constitutionally protected, Barefoot v. Estelle, 463 U.S. 880, 887, 103 S.Ct. 3383, 3391-3392 (1983);

12   Harris v. Nelson, 394 U.S. 286, 290, 89 S.Ct. 1082, 1086 (1969), direct review of a criminal

13   conviction is the primary method for a petitioner to challenge that conviction.  Brecht v.

14   Abrahamson, 507 U.S. 619, 633, 113 S.Ct. 1710, 1719 (1993).  In addition, the state court's factual

15   determinations must be presumed correct, and the federal court must accept all factual findings made

16   by the state court unless the petitioner can rebut "the presumption of correctness by clear and

17   convincing evidence."  28 U.S.C. § 2254(e)(1); Purkett v. Elem, 514 U.S. 765, 115 S.Ct. 1769

18   (1995); Thompson v. Keohane, 516 U.S. 99, 116 S.Ct. 457 (1995); Langford v. Day, 110 F.3d 1380,

19   1388 (9th Cir. 1997).

20   C.      Procedural Default

21      Respondent argues that Petitioner's ineffective assistance of counsel claims are procedurally

22   defaulted as they were denied by the California Supreme Court as untimely.

23      In his traverse, Petitioner contends that California has no untimeliness rule that is well-

24   established and consistently followed in non-capital cases and there is cause and prejudice for any

25   "substantial delay" because Petitioner was unaware of the alleged ineffectiveness of counsel and he

26   filed the state habeas petition within one year of his conviction.

27      A federal court will not review claims in a petition for writ of habeas corpus if the state court

28   has denied relief on those claims by a state law that is independent of federal law and adequate to

6

1    support the judgment.  A federal court will not review a petitioner's claims if the state court has

2    denied relief of those claims pursuant to a state law that is independent of federal law and adequate

3    to support the judgment.  Ylst v. Nunnemaker, 501 U.S. 797, 801, 111 S.Ct. 2590, 2592 (1991);

4    Coleman v. Thompson, 501 U.S. 722, 729-30, 111 S.Ct. 2546, 2553-54 (1989); See, also, Fox Film

5    Corp. v. Muller, 296 U.S. 207, 210, 56 S.Ct. 183, 184 (1935).  A state court's refusal to hear the

6    merits of a claim because of petitioner's failure to follow a state procedural rule is considered a

7    denial of relief on independent and adequate state grounds.  Harris v. Reed, 489 U.S. 255, 260-61,

8    109 S.Ct. 1038, 1042 (1989).  This doctrine of procedural default is based on the concerns of comity

9    and federalism. Coleman, 501 U.S. at 730-32, 111 S.Ct. at 2554-55.

10        There are limitations as to when a federal court should invoke procedural default and refuse

11   to evaluate the merits of a claim because the petitioner violated a state's procedural rules.  Procedural

12   default can only block a claim in federal court if the state court "clearly and expressly states that its

13   judgment rests on a state procedural bar."  Harris v. Reed, 489 U.S. 255, 263, 109 S.Ct. 1038,1043

14   (1989).  For California Supreme Court decisions, this means the Court must specifically have stated

15   that it denied relief on a procedural ground.  Ylst v. Nunnemaker, 501 U.S. 797, 803, 111 S.Ct. 2590,

16   2594 (1991); Acosta-Huerta v. Estelle, 7 F.3d 139, 142 (9th Cir. 1993); Hunter v. Aispuro, 982 F.2d

17   344, 347-48 (9th Cir. 1991).  If the California Supreme Court denies petitioner's claims without any

18   comment or citation, the federal court must consider that it is a decision on the merits.  Hunter v.

19   Aispuro, 982 F.2d at 347-48.

20        In addition, a federal court may only impose a procedural bar on claims if the procedural rule

21   that the state used to deny relief is "firmly established and regularly followed."  O'Dell v. Thompson,

22   502 U.S. 995, 998, 112 S.Ct. 618, 620 (1991) (statement of Blackmun joined by Stevens and

23   O'Connor respecting the denial of certiorari); Ford v. Georgia, 498 U.S. 411, 423-24, 111 S.Ct. 850,

24   857 (1991); James v. Kentucky, 466 U.S. 341, 348-51, 104 S.Ct. 1830, 1835-37 (1984).  The state

25   procedural rule used must be clear, consistently applied, and well-established at the time of the

26   petitioner's purported default.  Fields v. Calderon, 125 F.3d 757, 760 (9th Cir. 1997); Calderon v.

27   United States Dist. Court (Bean), 96 F.3d 112, 129 (9th Cir. 1996), cert. denied, 117 S.Ct. 1569.

28   //

1   Federal courts "will not review a question of federal law decided by a state court if the

2   decision of that court rests on a state law ground that is independent of the federal question and

3   adequate to support the judgment." <u>Coleman v. Thompson</u>, 501 U.S. 722, 729, 111 S.Ct. 2546

4   (1991); <u>LaCrosse v. Kernan</u>, 244 F.3d 702, 704 (9th Cir. 2001).

5   If the court finds an independent and adequate state procedural ground, "federal habeas

6   review is barred unless the prisoner can demonstrate cause for the procedural default and actual

7   prejudice, or demonstrate that the failure to consider the claims will result in a fundamental

8   miscarriage of justice." <u>Noltie v. Peterson</u>, 9 F.3d 802, 804-805 (9th Cir. 1993); <u>Coleman</u>, 501 U.S.

9   at 750, 111 S.Ct. 2456; <u>Park</u>, 202 F.3d at 1150.

10   In <u>Bennett v. Mueller</u>, 322 F.3d 573 (9th Cir. 2003), the Ninth Circuit analyzed the burden of

11   proof in proving procedural default.  It held that "[o]nce the state has adequately pled the existence

12   of an independent and adequate state procedural ground as an affirmative defense, the burden to

13   place that defense in issue shifts to the petitioner.  The petitioner may satisfy this burden by asserting

14   specific factual allegations that demonstrate the inadequacy of the state procedure, including citation

15   to authority demonstrating inconsistent application of the rule.  Once having done so, however, the

16   ultimate burden is the state's." <u>Id</u>. at 586.

17       1.   <u>Independent and Adequate</u>

18   "For a state procedural rule to be 'independent,' the state law basis for the decision must not

19   be interwoven with federal law." <u>LaCrosse</u>, 244 F.3d at 704, *citing,* <u>Michigan v. Long</u>, 463 U.S.

20   1032, 1040-41 (1983); <u>see also</u> <u>Morales v. Calderon</u>, 85 F.3d 1387, 1393 (9th Cir. 1996), *quoting,*

21   <u>Coleman</u>, 501 U.S. at 735 ("Federal habeas review is not barred if the state decision 'fairly appears

22   to rest primarily on federal law, or to be interwoven with federal law.'").  "A state law is so

23   interwoven if 'the state has made application of the procedural bar depend on an antecedent ruling on

24   federal law [such as] the determination of whether federal constitutional error has been committed.'"

25   <u>Park</u>, 202 F.3d at 1152, *quoting,* <u>Ake v. Oklahoma</u>, 470 U.S. 68, 75 (1985)).

26   In <u>Bennett v. Mueller</u>, the Ninth Circuit ruled that the denial of a habeas petition based on the

27   untimeliness bar set forth in Robbins rests on state law grounds that are independent of federal law.

28   <u>Bennett v. Mueller</u>, 322 F.3d at 578.  The Bennett court, however, remanded for a determination

8

1  whether the timeliness bar was sufficiently "well-established and consistently applied" at the time

2  the default occurred to qualify as an adequate state procedural ground. Id. at 578.

3      Petitioner challenges the adequacy of the timeliness bar as applied to non-capital cases.

4  Petitioner contends that there is no published rule or standard setting forth the time frame for filing a

5  state habeas corpus petition and the Court of Appeal did not apply a state procedural rule, but rather

6  decided the petition on the merits.  Although there is a genuine issue whether the Robbins timeliness

7  bar is adequately and consistently applied, this issue can be resolved below by the exceptions to

8  procedural default.

9          2.    Cause and Prejudice or Miscarriage of Justice

10      Petitioner's claim that he did not discover his ineffective assistance of counsel claims until

11  after direct review had concluded does not demonstrate sufficient "cause" to excuse the procedural

12  default.  As Respondent submits, Petitioner knew or *should have* known of the factual and legal

13  grounds for his claims as of July 11, 1994, the date of his conviction, and he was required to seek

14  state habeas relief no later than April 10, 1996, the date his opening brief was filed on direct appeal.

15  Petitioner's claims deal with alleged ineffectiveness of trial counsel prior to the entry of judgment,

16  thus, there is no reason why Petitioner should not have known of the claims at the time of his

17  conviction.  Further, Petitioner does not elaborate, beyond the mere conclusory allegation, as to why

18  he was unaware of trial counsel's alleged ineffectiveness until after direct review was concluded.

19  The fact that Petitioner filed the state habeas petition within one year from the date direct review

20  became final is not cause to excuse procedural default because the claims could and should have

21  been brought earlier.[4]

22      Because Petitioner has failed to demonstrate "cause", the court need not reach whether the

23  California Supreme Court's citation to In re Robbins, was adequately and consistently applied in the

24  _____

25      [4]  The California Supreme Court's denial cited In re Robbins, 18 Cal.4th 770, 780 (1998).  In In re Robbins, the
California Supreme Court stated, "A petitioner must allege, *with specificity*, facts showing when information offered in
26  support of the claim was obtained, and that the information neither was known, nor reasonably should have been known, at
any earlier time.  It is not sufficient simply to allege in general terms that the claim recently was discovered, to assert that
second or successive postconviction counsel could not reasonably have discovered the information earlier, or to produce a
27  declaration from present or former counsel to that general effect.  A petitioner bears the burden of establishing, through his
or her specific allegations, which may be supported by any relevant exhibits, the absence of substantial delay."  Id. at
28  780(emphasis in original.)

9

1   state courts.  Further, even assuming that Petitioner had demonstrated "cause," Petitioner cannot

2   show "prejudice" because as reasoned below there is no merit to his claims.

3   D.      Ineffective Assistance of Counsel Claims

4           1.      Trial Counsel's Advisements During Plea Negotiations

5           Petitioner raises two claims of ineffective assistance of counsel.  First, Petitioner alleges that

6   during plea negotiations trial counsel failed to advise him that rape could be established without

7   vaginal penetration and that the maximum sentence he could receive was 26 years rather than 18

8   years.  Petitioner claims his refusal to pled guilty and accept the prosecution's plea offer was caused

9   by counsel's ineffectiveness.[5]  Second, Petitioner contends that trial counsel failed to secure

10  witnesses and evidence that he was so intoxicated at the time of the offense he was unable to form

11  the required intent.  Further, Petitioner contends that trial counsel failed to secure evidence to

12  impeach witnesses, including that he was not the victim's father and that she was not a virgin.

13          The law governing ineffective assistance of counsel claims is clearly established for the

14  purposes of the AEDPA deference standard set forth in 28 U.S.C. § 2254(d).  Canales v. Roe, 151

15  F.3d 1226, 1229 (9th Cir. 1998.)  In a petition for writ of habeas corpus alleging ineffective assistance

16  of counsel, the court must consider two factors.  Strickland v. Washington, 466 U.S. 668, 687, 104

17  S.Ct. 2052, 2064 (1984); Lowry v. Lewis, 21 F.3d 344, 346 (9th Cir. 1994).  First, the petitioner must

18  show that counsel's performance was deficient, requiring a showing that counsel made errors so

19  serious that he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment.

20  Strickland, 466 U.S. at 687.  The petitioner must show that counsel's representation fell below an

21  objective standard of reasonableness, and must identify counsel's alleged acts or omissions that were

22  not the result of reasonable professional judgment considering the circumstances. Id. at 688; United

23  States v. Quintero-Barraza, 78 F.3d 1344, 1348 (9th Cir. 1995).  Judicial scrutiny of counsel's

24  performance is highly deferential.  A court indulges a strong presumption that counsel's conduct falls

25  within the wide range of reasonable professional assistance.  Strickland, 466 U.S. 668, 687, 104

26  S.Ct. 2052, 2064 (1984); Sanders v. Ratelle, 21 F.3d 1446, 1456 (9th Cir.1994).

27

28          [5] Respondent's answer does not challenge the existence of the plea offer or its term.

10

Second, the petitioner must show that counsel's errors were so egregious as to deprive defendant of a fair trial, one whose result is reliable. Strickland, 466 U.S. at 688. The court must also evaluate whether the entire trial was fundamentally unfair or unreliable because of counsel's ineffectiveness. Id.; Quintero-Barraza, 78 F.3d at 1345; United States v. Palomba, 31 F.3d 1356, 1461 (9th Cir. 1994). To set aside a conviction or sentence solely because the outcome would have been different, but for counsel's error, may grant the petitioner a windfall to which the law does not entitle him. Lockhart v. Fretwell, 506 U.S. 364, 369-70, 113 S.Ct. 838, 842 (1993). Thus, if the court finds that counsel's performance fell below an objective standard of reasonableness, and that but for counsel's unprofessional errors, the result of the proceeding would have been different, the court must then ask whether despite the errors and prejudice the trial was fundamentally fair and reliable. Id.

A court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the petitioner as a result of the alleged deficiencies. Strickland, 466 U.S. 668, 697, 104 S.Ct. 2052, 2074 (1984). Since it is necessary to prove prejudice, any deficiency that does not result in prejudice must necessarily fail.

Ineffective assistance of counsel claims are analyzed under the "unreasonable application" prong of Williams v. Taylor, 529 U.S. 362 (2000). Weighall v. Middle, 215 F.3d 1058, 1062 (2000). With this standard in mind, the Court now turns to each of Petitioner's claims of ineffective assistance of counsel.

With regard to Petitioner's first claim, it is without merit. Petitioner claims that he rejected the prosecution's plea offer because his trial counsel misadvised that vaginal penetration was not required to constitute rape. At the preliminary hearing, Priscilla testified that Petitioner's penis touched the lips of her vagina as he was attempting to put it in her. (CT 16.) Petitioner had Priscilla's legs up in the air, but his penis would not go in. (Id.) At the close of the evidence, defense counsel argued that because Priscilla testified that there was no penetration there was no intercourse and no rape. (CT 37.) However, the prosecutor argued that the testimony supported that there was lip penetration and penetration, however, slight is sufficient for the crime of rape. (CT 38.) The court found there was sufficient evidence to support the rape charge. (CT 38-39.)

1      Petitioner's trial counsel, Mr. Cummings, presented a declaration to the state courts in which

2      counsel clearly indicates that he did not advise Petitioner that he could not be convicted of rape if

3      there was no vaginal penetration.  (Exhibit 76, in support of Petition.)  As Respondent submits,

4      Petitioner told his trial counsel that the assault never occurred and that the witness was lying.  (Id.)

5      Petitioner's innocence claim is inconsistent with his current contention, which was formed only after

6      being convicted, that he would have pled guilty had he known he could be convicted of rape without

7      vaginal penetration.

8      In light of Mr. Cumming's declaration that he did not inform Petitioner that he could not be

9      convicted of rape without penetration, there was no deficient performance.  Although Petitioner

10     claims that counsel informed him otherwise, at the preliminary hearing, defense counsel argued, and

11     the trial court rejected the argument that there could be no rape because there was no penetration.

12     Petitioner was therefore on notice that rape can be accomplished without actual vaginal penetration.

13     Petitioner presents no evidence, beyond his conclusory allegation, that trial counsel advised him

14     otherwise.  Accordingly, Petitioner's claim fails on the merits.  Further, Petitioner never mentioned

15     any misadvisement on the part of his trial counsel; rather, the record demonstrates that it was

16     Petitioner's own misbelief, not through counsel, that there was no rape.

17     Petitioner's claim that he was misadvised regarding the maximum sentence that could be

18     imposed if he were convicted is also without merit.  Petitioner claims that he specifically asked his

19     trial counsel, Mr. Cummings, what the maximum sentence were if he went to trial and lost, and he

20     was advised that if convicted on all charges, the maximum possible was 18 years.  Petitioner claims

21     that had he been properly advised that the maximum exposure was 26 years, he would have accepted

22     the plea offer of 16 years.

23     In his traverse, Petitioner argues that the difference between counsel's erroneous advice about

24     the maximum punishment and the actual maximum Petitioner was facing was 8 years, which is a

25     substantial difference representing almost one third of the actual sentence imposed.  However, the

26     difference between the represented maximum sentence and the proposed plea offer was only 2 years.

27     Petitioner claims that he never evidenced an unwillingness to enter into any plea bargain.  Further,

28     Petitioner submits that his previous convictions were based upon guilty pleas, and this evidences a

12

preference for pleading guilty in lieu of going to trial.  Petitioner claims that he attempted to raise this issue in his Marsden motion by citing the case of In re Lewallen, 23 Cal.3d 274 (1979), for his belief that the court was going to impose a sentence greater than what was permitted by law because Petitioner went to trial.

Mr. Cummings declared that he did not remember what he informed Petitioner the maximum sentence was that he faced.  (Exhibit 76, in support of petition.)  Even assuming that trial counsel was ineffective in misadvising Petitioner regarding the maximum exposure he faced if convicted on all counts, there was no resulting prejudice.  This is not a case in which counsel failed to advise Petitioner, at all, regarding the maximum sentence; rather, this is a case of alleged misadvisement.

Respondent argues that precedent in this circuit makes clear that any disparity between counsel's predicted sentence and the actual sentence must be extreme, and "disparities of up to twenty years are not gross mischaracterizations."  Iaea v. Sunn, 800 F.2d 861, 865 (9th Cir. 1986); see also United States v. Nguyen, 997 F.Supp. 1281 1289 (C.D. Cal. 1998).  In opposition, Petitioner argues that the Supreme Court's decision in Glover v. United States, 531 U.S. 198 (2001), effectively undermines that a gross mischaracterization is required to show prejudice.  In Glover, the Supreme Court rejected the concept that "a minimum amount of additional time in prison cannot constitute prejudice" under Strickland.  Id. at 203.  In Glover, the petitioner was convicted of several federal offenses.  The district court held that the money laundering counts should not have been grouped with the other offenses, a decision which increased the petitioner's offense level by two levels.  Petitioner's attorneys did not offer any argument in opposition to the court's decision nor did the attorneys raise the issue on appeal.  In ruling on Petitioner's § 2255 motion, the district court held that under Seventh Circuit precedent an increase in a sentence of six to twenty-one months was insufficient to constitute prejudice for purposes of Strickland.  The Supreme Court reversed, rejecting the notion that a showing of prejudice under Strickland requires a significant increase in a term of imprisonment.

This court rejects Petitioner's contention that Glover overrules the existing Ninth Circuit precedent.  Glover is inapplicable because there is no error in the application of the sentencing guidelines in determining Petitioner's sentence.  Further, Glover did not deal with a claim that

13

counsel misadvised during the plea negotiation stage.  <u>Glover</u> dealt with an instance in which there was an error in the law regarding a calculation of the actual sentence imposed, and it is therefore distinguishable from an erroneous prediction regarding the potential sentence.  In fact, the Ninth Circuit Court of Appeals recently reiterated that in order to prove an ineffective assistance of counsel claim based on an erroneous prediction, there must be a "'gross mischaracterization of the likely outcome' of a plea bargain 'combined with . . . erroneous advice on the probable effects of going to trial.'"  <u>Sophanthavong v. Palmateer</u>, 378 F.3d 859, 868 (9th Cir. 2004) (citing <u>United States v. Keller</u>, 902 F.3d 1391, 1394 (9th Cir. 1990)(quoting <u>Iaea v. Sunn</u>, 800 F.2d 861, 864-865 (9th Cir. 1986); <u>see also</u> <u>Riggs v. Fairman</u>, 399 F.3d 1179 (9th Cir. 2005).  The Court additionally stated that in order to establish an ineffective assistance of counsel claim based on alleged erroneous advice regarding a guilty plea, a petitioner must demonstrate more than a "mere inaccurate prediction."  <u>Sophanthavong</u>, at 868 (citing <u>Iaea v. Sunn</u>, 800 F.2d at 865.  <u>Glover</u> is a sentencing case in which legal error by counsel resulted in a longer sentence for the petitioner.  This case, however, involves an alleged error in advisement about the length of sentence Petitioner was facing and would not have been an error that occurred at sentencing but rather pretrial.

Initially, the fact that Petitioner may have previously pled guilty for prior crimes, in lieu of going to trial, does not support a finding that Petitioner would have pled guilty in this instance.  If Petitioner truly felt that he was innocent and the assault never occurred, pleading guilty would be inconsistent with that position.   Although there is no evidence in the record to demonstrate that Petitioner was specifically advised of the maximum sentence he faced if convicted on all counts, there was not a gross mischaracterization of the purported maximum sentence and the actual sentence imposed.

The Court agrees with Respondent and finds that in light of the following cases, the 8 year disparity in this case is not a "gross mischaracterization" of the actual sentence imposed by the trial court.  <u>See</u>, <u>e.g.</u>, <u>Deoganiere v. United States</u>, 914 F.2d 165 (9th Cir. 1990) (no gross mischaracterization where defendant received 15 years prison followed by 20 years of probation instead of the 12 years predicted); <u>United States v. Garcia</u>, 909 F.2d 1346, 1348 (9th Cir. 1990) (no gross mischaracterization where defendant received 19 years instead of the 8 years predicted); <u>cf</u>.

14

1   United States v. Chancon-Palomares, 208 F.3d 1157, 1159 (9th Cir. 2000) (gross mischaracterization

2   possible where defendant was purportedly told the maximum sentence he would receive was six

3   months, but received a 108-month sentence); Chacon v. Wood, 36 F.3d 1459, 1464-65 (9th Cir.

4   1994) (gross mischaracterization where the defendant was told he would likely only serve three

5   months in prison when in fact the defendant served a ten-year sentence); Iaea v. Sunn, 800 F.2d 861,

6   865 (9th Cir. 1986) (defense counsel's performance was deficient when he predicted probation but

7   the defendant received a life sentence).

8        Further, Petitioner received six years for his prior prison terms.  It was Petitioner's prior

9   prison terms that made his sentence jump from 20 years to 26 years.  Petitioner's claim that counsel

10  advised that he could receive a maximum of 18 years if convicted on all counts did not substantially

11  prejudice Petitioner as it was only a 2 year difference because Petitioner received 20 years on the

12  charged offenses.  There was only a 2 year difference between the alleged 18 year maximum advised

13  by counsel and the 16 year plea offer, a two year difference between counsel's alleged

14  misadvisement and the actual imposition of the sentence on the charged offenses.

15       Based on the foregoing, Petitioner's allegations simply do not demonstrate that counsel's

16  alleged prediction of the maximum sentence was a gross mischaracterization of the actual sentence

17  imposed.  Accordingly, Petitioner fails to state a claim for relief.

18       2.   Trial Counsel's Failure to Properly Impeach Victim and Present Evidence of
          Intoxication

19

20  Petitioner contends the following:

21       My trial counsel failed to investigate or secure witnesses or evidence to show
     that I was so intoxicated at the time of the offenses to have been incapable of forming
22   the required specific intent.  Counsel also failed to secure important evidence to
     impeach the victim, including that I was not her father and that she was not a 'virgin'.
23   These errors were repeated by counsel representing me at sentencing, who also failed
     to demonstrate that intoxication precluded consecutive sentencing per 667.6(d).
24   (Petition, Ground 2.)

25  Petitioner contends that trial counsel was ineffective for not impeaching Priscilla with

26  evidence that she was not his daughter by blood relation.  Mr. Cummings declared that he was aware

27  of Petitioner's assertion that the victim was not his natural daughter.  "However, [he] did not pursue

28  an investigation into the matter because [he] believed that the matter was irrelevant and would

1    probably be more prejudicial to [Petitioner] if brought out." (Cummings Declaration, Exhibit 77 to

2    Petition.)

3         As submitted by Respondent, Petitioner has failed to demonstrate that counsel's actions were

4    either deficient or prejudicial.  Petitioner's relationship with Priscilla was irrelevant to the charged

5    offenses.  It was not required that Petitioner be the father of the victim in order to be convicted of the

6    offenses.  There is no evidence that the jury convicted Petitioner based on the fact that Petitioner was

7    the father of the victim, nor is there any evidence that the jury would not have convicted Petitioner

8    had he not been the father of the victim.  Thus, there was no impeachment value to the fact that

9    Petitioner was not, in fact, the father of Priscilla.  Although there is evidence that Petitioner was not

10   the father of Priscilla and this was known in March of 1994, Petitioner simply has not demonstrated

11   prejudice.

12        Even assuming Mr. Cummings was deficient in failing to impeach Priscilla with the fact that

13   Petitioner was not her father, there is no evidence that the outcome would have been any different.

14   Petitioner's argument that society condemns father-daughter incest as one of the most heinous crimes

15   is speculative and does not support a finding that the outcome would have been different.  Further,

16   the fact that Priscilla may have been impeached with the fact that Petitioner was not her father and

17   that she was lying, is of little value to the crime which Petitioner committed.  The fact that the

18   impeachment would have cast serious doubt on Priscilla's testimony is speculative and does not

19   demonstrate that the outcome would have, in fact, been different.  As previously noted, there is no

20   evidence that the jury relied on the fact that Petitioner was Priscilla's father, and it was not a

21   necessary finding in order to convict Petitioner; thus, it is of little relevance.

22        Further, Petitioner's claim that the trial judge relied on the fact that he was the victim's father

23   is without merit.  Although the trial court cited that Petitioner was the father of Priscilla and that

24   there was a position of trust, it does not appear that this was the determinative factor in determining

25   how Petitioner would be sentenced.  The trial judge stated in part the following:

26            There's no question that what occurred ought not to have occurred, whatever
             faults they may have.  And what I'm going to do, Mr. Bracamonte, I see no excuse, I
27           see no assistance of Mr. Bracamonte.  The difficult part in this case for the court to
             focus on, Mr. Treisman, is Mr. Bracamonte was under the influence of alcohol and
28           marijuana at the time, and my recollection was that he was significantly under the

1  influence.  Probably had he not been so under the influence, this - - these whole
2  events might not have occurred and had they occurred, then he might have been able
   to effectively penetrate and things would have been worse.  So we have that situation
   probably.
3          This is not a case where probation can be granted.  Defense's application for a
4  grant of probation is formally denied.  The defendant's prior history of six counts of
   driving under the influence of alcohol - - we know that Mr. Bracamonte has had a
5  problem with alcohol for a long time; the first arrest occurred on August 7th, 1977,
   with the most recent [on] January 15th, 1984.  So he always has a problem of taking
6  other people's property, some problems with acts of violence, and, of course, the
   biggest thing, the one which he was sent to prison was the robbery and also the
   manslaughter.  That's a fairly significant history.
7          Also, he's not been successful with probation and parole and was on parole
   when the incident offense occurred.  Probation officer has noted those factors and
8  those circumstances and aggravation.  The probation officer has noted the violence
   involved in this instance, the harm to the victim, the threat of great bodily harm,
9  coming from a father.  These certainly are cruel things and viscous and callous, but
   probation officer points out that this victim was apparently vulnerable.  She was alone
10 with the defendant.  He is a fairly large man and she's a petite girl.  He did take
   advantage of a position or trust of comfort to have her go with him to this isolated
11 location where the offenses took place.
12         The facts related to the defendant are that he engaged in violent conduct,
   which would indicate that he is a serious danger to society, has numerous convictions.
13 They are increasing in seriousness and I've noted in the last particular robbery, the
   robbery and the manslaughter, he was on parole when the crime was committed and
   he has not done well on probation or parole in the past.
14         The sole circumstance of mitigation that the Court has been able to find is that
   the defendant was really severely intoxicated and under the influence of marijuana
15 when the attack took place.  I have to agree with the district attorney.  I've considered
   the weight to be given to the one instance or one circumstance in mitigation, the state
16 of his intoxication at the time that the crime occurred.  However, because of the
   extensive background, the fact that he went with the victim to the location, that he
17 did, [sic] appears to the Court that the aggravating circumstances do outweigh the sole
   mitigating circumstance.
18
   (RT 72-74.)
19

20         As the record demonstrates, Petitioner's sentence was based on Priscilla's young age; his

21 extensive and violent criminal history; his repeated failures on probation and parole; the use of force

22 and threat of violence against Priscilla during the commission of the crime; Priscilla's vulnerability,

23 which included being taken to an isolated location to be raped, his position of trust or confidence,

24 and Petitioner's large size and Priscilla's small size.  The trial court referenced the fact that

25 Petitioner was Priscilla's father; however, in light of all the other aggravating circumstances it does

26 not appear that this was a material factor in imposing the sentence.  Regardless of whether Petitioner

27 was in fact the victim's father, there was nonetheless a relationship of trust between the two of them

28 of which Petitioner took advantage.  Based on the foregoing, Petitioner's claim is without merit.

17

1    Petitioner further argues that trial counsel was ineffective for failing to present evidence to

2    refute the prosecution's assertion that Priscilla was a virgin.  In closing argument, the prosecutor

3    made reference to the fact that the law was not going to give Petitioner a break just because he was

4    not able to make penetration because Priscilla was only 15 years old and a virgin.  (RT 563.)  In

5    response, Petitioner argues that the testimony regarding virginity began with Priscilla's statement

6    that "He told me - he goes, 'You're a virgin, huh.  I'm not going to do this to you, Priscilla." (RT

7    389.)  Petitioner argues that the impact of this statement depends on whether Petitioner would or

8    would not have believed that Priscilla was a virgin when he allegedly made that statement.

9    Petitioner reasons that because he knew that Priscilla was not a virgin, counsel should have attacked

10   Priscilla's credibility.

11   As Respondent submits, Petitioner has not shown that he timely provided defense counsel

12   with evidence that Priscilla had previously thought that she might be pregnant.  Although Petitioner

13   claims to have known that Priscilla was not a virgin as early as October of 1991 when a pregnancy

14   test was administered at Saint Agnes Hospital in Fresno, Petitioner does not demonstrate that his

15   counsel was made aware of this.  In any event, it was not necessary that Priscilla be a virgin in order

16   for Petitioner to be convicted of rape.  As Respondent reasons, the reference made by the prosecutor

17   to Priscilla being a virgin was made in the context of explaining why Petitioner may not have been

18   able to fully penetrate her.  It was entirely gratuitous.  Penetration, however slight, was all the jury

19   needed to find.  Why there was not complete penetration is immaterial.  Thus, even assuming

20   counsel was deficient in failing to impeach Priscilla with this fact, Petitioner has not, and likely

21   cannot, demonstrate prejudice.  Petitioner simply has not shown there is a reasonable probability that

22   "but for" omission of this evidence, he would not have been convicted on the charged counts.

23   Strickland, 466 U.S. at 694.

24   Finally, Petitioner claims counsel was ineffective for not presenting evidence that he had

25   consumed alcohol and drugs prior to the rape.  Petitioner claims that evidence of his intoxication and

26   history of alcoholism would have shown that he was unable to form the intent necessary for rape and

27   that he did not reflect on his actions.

28   //

18

1      Initially, the court notes that in California, evidence of voluntary intoxication may be

2  introduced only to negate specific intent.  Cal. Pen. Code § 22(b); People v. Williams, 26 Cal.4th

3  779, 789 (2001); People v. Chaffey, 25 Cal.App.4th 852, 855 (1994); CALJIC No. 4.21 (CT 105).

4  Sexual battery (count 3), in violation of California Penal Code section 243.4(a) is a specific intent

5  crime.  Evidence of voluntary intoxication, however, is not a defense to general intent crimes.

6  People v. Osband, 13 Cal.4th 622, 685 (1996); CALJIC No. 4.20 (CT 104).  Rape (count 1), forcible

7  oral copulation (count 2), and false imprisonment (count 4) are general intent crimes.    Thus, any

8  intoxication defense would only go to negate count 3 - sexual battery.

9      Petitioner argues that witness Gilbert Gonzales would have testified that contrary to

10  Priscilla's testimony, Priscilla, not Petitioner, was driving the vehicle at the time in question.  At the

11  Marsden hearing, Mr. Gonzales testified that on the day in question Petitioner was very drunk and

12  Priscilla was driving the vehicle.  (Marsden hearing at 23:18-22.)  Any argument that this evidence

13  could have been used to impeach Priscilla and support Petitioner's intoxication defense is minimal,

14  at most.

15      As the trial judge stated at the Marsden hearing,

16          [A]s to Mr. Gonzalez, he certainly could have testified to the degree of
       intoxication of defendant.  However, Mr. Gonzalez was also drinking, so there would
17      be a question as to how credible he would be.  The jury could totally disregard his
       testimony, because he had also been drinking, and he's a friend of the defendant.
18      Assume some impeachment of the victim, however slight, in this case that she
       testified she wasn't driving, her dad had been driving.  And we have a witness who
19      could put her behind the wheel.  Would have testified that in his opinion she was
       driving.  Well, as I said, the Defendant was loaded.  And since he had known him for
20      a number of years he could tell - - he saw how bad off he was.
          On the other hand, I don't know what that would have added to the testimony
21      that did come before the jury.  Defendant could not get a full erection, because he was
       so drunk.  The victim testified that he was drunk.  So I don't know how much that
22      would have added.  Something for the jury to consider.

23  (Marsden hearing, at 49.)

24      At the Marsden hearing, Mr. Cummings testified as follows with respect to Mr. Gonzalez's

25  testimony:

26          At the time supposedly that the Defendant and victim arrived back at the
       Defendant's house, the testimony was that Defendant was driving.  If I was going to
27      indicate - - my understanding of Mr. Gonzalez' testimony was that the victim was
       driving.  Now, if all he's testifying to is that the victim was driving before the
28      incident, I don't know if that's relevant at all.  I mean, maybe it is.  Maybe, you know,

19

1    if he says she's driving, she says she never drove the car, that's some slight
2    impeachment.  I think what I was concentrating on is what happened between the
     alleged incident and when it was reported.

3    (Marsden hearing, at 26-27.)

4    Mr. Cummings essentially stated that whether Priscilla was driving the vehicle earlier that

5    day is irrelevant to whether she was driving during and after the incident.  (<u>Id</u>.)

6    Mr. Cumming's reasoning that it was irrelevant that Priscilla was driving the vehicle earlier

7    in the day due to Petitioner's intoxication, is reasonable.  Priscilla testified that Petitioner was drunk

8    at the time the incident occurred, and there was no contradictory evidence.  Thus, Mr. Gonzalez's

9    testimony does not provide much more support.  Moreover, Petitioner's primary theory of defense

10   was that Priscilla was fabricating the whole incident, and she was not trustworthy. (RT 575-583.)   In

11   the alternative, any action on the part of Petitioner was merely an attempted rape.  (RT 583.)  An

12   intoxication defense suggests a lack of intent, which is inconsistent with a complete denial of the

13   entire incident, which as previously stated was the primary defense.  Thus, it would be inconsistent

14   to argue that Priscilla was lying on the one hand, and that Petitioner was intoxicated at the time of

15   the offense and therefore could not have formed any intent.  The inconsistency in these two

16   arguments lessens the amount of prejudice that would result from failing to argue one of them.

17   Petitioner's claim that the intoxication defense was not limited to the intoxication at the time of the

18   incident, but rather to his life history of alcoholism and drug abuse, is without merit.  That Petitioner

19   has had an extensive alcohol and drug problem for years prior to the incident, which has caused

20   blackouts and other side effects, is of no relevance to the crimes of which he was charged.  There

21   was no evidence, and Petitioner makes no argument that his prior alcohol and drug problems caused

22   any of the cited side effects, such as a blackout, at the time the rape occurred.

23   Even assuming it was deficient for counsel to fail to call Mr. Gonzalez to the witness stand in

24   support of an intoxication defense, Petitioner fails to demonstrate how the outcome would have been

25   different.  As stated by the trial judge, Mr. Gonzalez's testimony would not have added much more

26   evidence, beyond what was already in the record, as to Petitioner's state of intoxication at the time of

27   the offense.  Thus, there is not a reasonable probability that the outcome would have been any

28   different had Mr. Gonzalez testified at trial.

Petitioner cites to the testimony of Priscilla in which she acknowledged that Petitioner said "he did not know what he was doing." (RT 390.) This statement is taken out of context. The testimony by Priscilla was that after the two arrived at the field, Petitioner asked Priscilla to show him her breasts. (RT 372.) Petitioner got angry when Priscilla resisted, telling her to "shut up" and to show him her breasts. He then grabbed her breasts, remarking that there was nothing she could do. (RT 374.)

Priscilla opened her car door, and Petitioner ran to her side of the car. (RT 374-375.) He forced Priscilla back into the car, telling her he would not let her go and that "he's going to fuck" her. (RT 375-377.) He then forcibly removed Priscilla's shoes and jacket, and told her to take off her shirt. (RT 378-380.) Priscilla continued to resist, and begged him to take her home. (RT 380-381.) Petitioner told her to shut up. (RT 381.) Petitioner then lifted up Priscilla's shirt and bra and began sucking hard on her breast. (RT 381-382.) Petitioner then told Priscilla to take off her pants. When she refused, Petitioner unbuttoned her buttons and removed the pants himself. (RT 382-384.) Priscilla screamed and Petitioner struck her several times. (RT 383-384.) He continued to tell her to shut up. (RT 384.) Petitioner eventually removed Priscilla's pants, tights and underwear. (RT 385.) He then lifted her legs in the air, and Priscilla felt his penis touch the inner lips of her vagina. (RT 387-388.) Priscilla told Petitioner she was a virgin and again begged him to stop. (RT 389.) Petitioner stopped the attack and apologized, saying that he did not know what he was doing. (RT 390.)

Petitioner then stated that he was "going to get something out of you before I take you home," and told her to "suck his dick." (Rt 390-391.) Priscilla pleaded for him not to make her, but he told her it was easy like licking "a lollipop." (RT 391-393.) He forced Priscilla's head into his lap and again told her to "suck his penis." (RT 392.) His penis entered her mouth, and Priscilla noticed what appeared to be sperm come out of his penis. (RT 394.) Priscilla begged him not to ejaculate in her mouth, and Petitioner agreed. (RT 394.) When Priscilla began to get physically ill, Petitioner stopped and zipped up his pants. (RT 395.) Petitioner stepped outside the car, told her he would take her home, and apologized. (RT 395-396.) Petitioner indicated that he could not take her home because her uncles were there and he would be arrested. (RT 396.) Later, he said he was going to "turn himself in." (RT 396.)

Petitioner argues that his statement that he did not know what he was doing was consistent with an intoxication defense.  This argument overlooks the fact that Petitioner continued to assault Priscilla as he made her perform oral copulation upon him, which is consistent with a finding that Petitioner did know what he was doing and what he was attempting to achieve, i.e. sexual gratification.  After the incident, Petitioner was aware enough to express that he would be arrested if he took Priscilla home, thus, he knew what he had done was wrong.  Further, as Respondent argues, Petitioner conversed with Priscilla prior to and during the commission of the offenses; he gave her specific instructions on what to do; he ordered her to perform sexual acts; he demonstrated that he was capable of making decisions and formulating a plan when he drove her to an isolated area to commit the assault; he manifested a consciousness of guilt contemporaneous with the commission of the crimes, twice apologizing for his actions and indicating that he could not take Priscilla home because her uncles were there and he would be arrested, and then later stating that he was going to turn himself in.  Based on Petitioner's actions during the commission of the crimes, an intoxication defense would not have likely negated any specific intent on his part.

Petitioner further argues that counsel was deficient in failing to call expert witness, Claudio Perez, in support of an intoxication defense.   In support of his petition, Petitioner attaches a copy of a letter written by Mr. Perez, which states in part:

> I have known Elias over 25 years as a teacher, coach, and counselor.  As a counselor I have worked with Elias attempts to control his alcoholism; but the false sense of control that all alcoholics have, has kept him from seeing the need to control his alcoholism.  Elias Bracamonte is a chronic (Gamma) alcoholic, and to my knowledge he has been one since before high school.  He is a clinical alcoholic who is "powerless not to drink."  Elias, when he is out of jail, will generally drink on a daily basis.  He will generally take a alcoholic drink in the morning, just to be able to function; and because alcohol gives him the false impression that he can control his drinking, he will drink throughout the day, and start his heavy drinking after work.  Once he starts his heavy drinking, Elias will, many times, involuntarily drink until he is unconscious; but before becoming unconscious, he will have a neurologic reaction to the alcohol.  He will have radically reduced coordination; he will have extremely poor short term memory, and spatial perceptions are effected.  Generally, Elias will have this type of reaction after drinking two cases of beer, more or less, and many times Elias will complicate and worsen his condition by ingesting drugs, such as depressants or other drugs, or smoking marijuana.  This evaluation is made from the many contacts I had with him when he was drinking.
> Elias is descriptive of chronic alcoholics and their lack of physical control.  At the stage of drunkenness described by the testimony of Gilbert Gonzales and the statement from Elias Bracamonte, Elias would have very limited physical coordination, spatial perception, and very disoriented, and could not be able to carry

1    out the assault as described in the pre-sentence report.
          In addition to his lack of physical control, Elias Bracamonte also exhibits
2    behavior that is like toxic psychosis, when he is at the stage of drinking reported by
     Elias' statement and Gilbert Gonzales' testimony.  He lacks cohesiveness in his thinking, his statem
3         In summary, and after reading the testimony of Gilbert Gonzales, the pre-
     sentence report, a statement by Elias Bracamonte, and excerpts from a discussion
4    between the judge and Elias Bracamonte, I have come to a determination that Elias
     Bracamonte, because of his level of intoxication which was exasperated by the use of
5    marijuana and other drugs, as reported by the aforementioned documents, could not
     have formed the intent to assault Priscilla, nor could he have reflected on any of his
6    actions that evening, to evaluate whether or not they were appropriate.  This lack of
     consciousness is due to the toxic affect alcohol has on Elias Bracamonte.
7
     (Exhibit L at 60-61, in support of petition.)
8

9        During the Marsden hearing, trial counsel indicated that he was aware of Mr. Perez being a

10   longtime friend and counselor, but he did not want to open the door to character testimony.  Counsel

11   was fearful that Petitioner's prior record would come in at that time, and he therefore felt it was in

12   Petitioner's best interest not to bring in a character witness.  (Marsden hearing, RT at 17-18.)  The

13   trial judge agreed with counsel stating that "if you open up the door to character testimony because

14   your client's background may have opened up Pandora's Box, and it would have been better to save

15   Mr. Perez for any possible sentencing, character testimony.  Mr. Perez, although he's a friend of the

16   Defendant and known him for years possibly could have harmed him more by opening the door to

17   character testimony.  I have no criticism of you in that regard."  (Id. at 43-44.)  Further, as previously

18   stated, trial counsel's primary defense was that Priscilla was fabricating the entire incident and she

19   was untrustworthy.  A defense that Petitioner could not have formed the necessary intent to commit

20   the actual assault would have been inconsistent with that defense.  Thus, based on the foregoing, it

21   was not unreasonable for trial counsel to fail to call Claudio Perez as a witness in support of an

22   intoxication defense.

23       Based on the foregoing, a reasonable attorney could have concluded that a defense based on

24   lack of intent due to voluntary intoxication would not have succeeded at trial.  As stated by the trial

25   judge at the Marsden hearing, "During the course of a trial counsel have to make a number of tactical

26   decisions as to what defense to pursue, sometimes there's a possibility of conflicting defenses.  And

27   obviously you have to have a theme for your case, your defense, and you have to pick and choose

28   one.  Sometimes before the trial commences you believe you're going to use one, and as the trial

                                                    23

progresses, good thing you haven't made an opening statement and committed yourself, you are free to pick and choose as the case develops. And you may have to be somewhat flexible in your defense of the Defendant." (Marsden hearing, at 42-43.)    Although Petitioner may disagree, in hindsight, with trial counsel's defense strategy, this nonetheless does not support a claim for relief. In any event, even if counsel was deficient in failing to present evidence of intoxication, Petitioner has not demonstrated that there was a reasonable probability that the jury would have found that he was unable to form the requisite intent.

Lastly, Petitioner contends that counsel's failure to present an intoxication defense prevented him from being able to demonstrate at the time of sentencing that he was incapable of the reflection necessary for the court to impose full consecutive sentences under section 667.6(d). Petitioner's claim is without merit. As Respondent argues, Penal Code section 667.6(d) requires only that the crimes occur on separate occasions. In making this determination, the trial judge determines whether the defendant "had a reasonable opportunity to reflect" on his actions before resuming sexually assaultive behavior. It does not, as Petitioner contends, require actual reflection. Thus, whether Petitioner was too intoxicated to reflect on his actions is immaterial for sentencing under section 667.6(d). *See e.g.* People v. Garza, 107 Cal.App.4th 1081 (2003), certified for partial publication.) Further, the trial judge was well-acquainted with the level of Petitioner's intoxication at the time of sentencing, and it was not unreasonable for counsel not to call Claudio Perez as a character witness at sentencing. In fact, at sentencing, the trial judge considered the fact that Petitioner was intoxicated at the time of the offense as a circumstance in mitigation. Specifically, the trial judge stated:

> The sole circumstance of mitigation that the Court has been able to find is that the defendant was really severely intoxicated and under the influence of marijuana when the attack took place. I have to agree with the district attorney. I've considered the weight to be given to the one instance or one circumstance in mitigation, the state of his intoxication at the time that the crime occurred.
>
> However, because of the extensive background, the fact that he went with the victim to the location, that he did, appears to the Court that the aggravating circumstances do outweigh the sole mitigating circumstance.

(RT 74.)

//

24

1    In addition, the jury heard evidence that Petitioner was intoxicated at the time of the incident,

2  and the jury was instructed as to the legal effect of a finding of intoxication.  In fact, in closing

3  argument, Mr. Cummings argued that there was evidence from Priscilla that she and Petitioner had

4  smoked marijuana in the field and they were under the influence.  There was further testimony from

5  a detective who indicated that Petitioner told him that he had been using drugs for several days prior

6  to the incident.  (RT 574.)  The jury was specifically instructed as follows:

7           In the crime of sexual battery, of which the Defendant is accused in count
        three, the necessary element is the existence in the mind of the Defendant of his
8        specific intent to cause sexual arousal, sexual gratification, or sexual abuse.  In the
        crime of attempted rape, which is a lesser crime to that alleged in count one, a
9        necessary element is the existence in the mind of the Defendant of the specific intent
        to commit rape.
10           If the evidence showed that the Defendant was intoxicated at the time of the
        alleged offense you should consider that fact in determining whether the Defendant
11        had such specific intent.  If from all the evidence you have a reasonable doubt
        whether the Defendant formed such specific intent, you must find that he did not have
12        such specific intent.
             Intoxication of a person is voluntary if it results from a willing use of an
13        intoxicating liquor, drug, or other substance, knowing that it is capable of an
        intoxicating effect, or when he willingly assumes the risk of that effect.  Voluntary
14        intoxication includes the voluntary ingestion, injection, or taking by any other means
        of any intoxicating liquor, drug, or other substance.
15
        (RT 599-600.)
16

17    Based on a review of the entire record, Petitioner has not demonstrated that but for counsel's

18  conduct, there was a reasonable probability that the result would have been different had counsel

19  presented evidence of Petitioner's intoxication.  Accordingly, Petitioner's claim is without merit.

20  E.    Due Process Claim

21    Petitioner contends that the trial court failed to make the required finding under section

22  667.6(d) when imposing consecutive sentences, thereby depriving him of his due process rights,

23  which applies when there is a single victim and if the defendant "had a reasonable opportunity to

24  reflect on his actions and nevertheless resumed assaultive behavior."  Petitioner appears to contend

25  that the trial court failed to make a specific factual finding under section 667.6(d) that Petitioner "had

26  a reasonable opportunity to reflect on his actions and nevertheless resumed assaultive behavior."

27    The role of this Court on federal collateral review of a state criminal conviction is limited to

28  determining whether the Petitioner's federal constitutional or other federal rights have been violated

1   and does not extend to review of a state's application of its own laws.  <u>Jackson v. Ylst</u>, 921 F.2d 882,

2   885 (9th Cir. 1990); <u>see</u>, <u>eg.</u>, <u>Cacoperdo v. Demosthenes</u>, 37 F.3d 504, 507 (9th Cir. 1994)

3   (recognizing that the decision whether to impose sentences concurrently or consecutively is a matter

4   of state criminal procedure and is not within the purview of federal habeas corpus).  Federal courts

5   must defer to the state courts' interpretation of state sentencing laws.  <u>Estelle v. McGuire</u>, 502 U.S.

6   62, 67-68 (1991); <u>Bueno v. Hallahan</u>, 988 F.2d 86, 88 (9th Cir. 1993).  Absent a showing of

7   fundamental unfairness, a state court's application or misapplication of its own sentencing laws does

8   not generally justify federal habeas relief.  <u>Christian v. Rhode</u>, 41 F.3d 461, 469 (9th Cir. 1994).  "So

9   long as the type of punishment is not based upon any proscribed federal grounds such as being cruel

10  and unusual, racially or ethnically motivated, or enhanced by indigency, the penalties for violations

11  of state statutes are matters of state concern."  <u>Makal v. Arizona</u>, 544 F.2d 1030, 1035 (9th Cir.

12  1976).

13         This Court finds that Petitioner's sentence was not fundamentally unfair.  <u>Estelle v. McGuire</u>,

14  502 U.S. 62, 67-68 (1991); <u>Bueno v. Hallahan</u>, 988 F.2d 86, 88 (9th Cir. 1993).  Petitioner was

15  sentenced for two separate incidents occurring at separate times, a permissible result under

16  California law.   In the probation report, it was recommended that consecutive sentences be imposed

17  on counts 1 and 2 pursuant to Penal Code section 667.6(d), explaining:

18         The defendant first committed the crime of rape and then allowed the victim
           to put on her clothes, giving him an opportunity to reflect upon his actions.  The
19         defendant ignored the victim's requests to take her home and told her she was going
           to orally copulate him before he would take her home.
20

21         (CT 363).  The trial court reviewed the probation report and ultimately imposed

22   consecutive sentences for counts 1 and 2 under section 667.6(d).  (RT 65-66, 75.)  Further,

23  Petitioner fails to demonstrate how the facts do not support a finding under this section.

24  Accordingly, Petitioner fails to state a claim for relief.

25  ////

26  ///

27  //

28  /

1

<u>ORDER</u>

2

Based on the foregoing, it is HEREBY ORDERED that:

3

1.    The petition for writ of habeas corpus is DENIED; and,

4

2.    The Clerk of Court is directed to enter judgment in favor of Respondent.

5

6

IT IS SO ORDERED.

7

**Dated:    May 17, 2005**                     /s/ **Sandra M. Snyder**
icido3                                              UNITED STATES MAGISTRATE JUDGE

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

27